No. 53,003

STATE OF KANSAS, *Appellee*, v. RONALD D. CHURCHILL, *Appellant.*

(646 P.2d 1049)

Opinion filed June 11, 1982.

*Scott Harrison Kreamer*, of Gardner, Davis, Kreamer, Norton, Hubbard & Ruzicka, Chartered, of Olathe, argued the cause, and was on the brief for appellant.

*G. Joseph Pierron*, assistant district attorney, and *Larry McClain*, assistant district attorney, argued the cause; *Robert T. Stephan*, attorney general, *Dennis W. Moore*, district attorney, and *G. Joseph Pierron* were on the brief for appellee.

The opinion of the court was delivered by

MILLER, J.: Ronald D. Churchill was convicted by a jury in Johnson District Court of murder in the first degree, K.S.A. 21-3401. He appeals, raising a number of issues, most of which challenge the propriety of the admission of evidence.

On January 30, 1980, Mr. and Mrs. Kerry Halling, with their three children, lived in a second floor unit of the Oak Park

apartment complex in Lenexa, Kansas. Mr. Halling left for work at a local bottling company at 4:30 o'clock that morning; a friend, David Stevens, who was staying with the Hallings, left the apartment around 5:30 o'clock a.m. As was his custom, Mr. Halling called his wife from work at approximately 9:15 o'clock a.m., and spoke with her briefly.

Mrs. Halling's mother, Teresa Peck, arrived at the apartment about 10:30 o'clock a.m. The oldest child, age three, told her that his mother was sick. Mrs. Peck went to the bedroom and found her daughter lying on the floor. Mrs. Halling had been subjected to a savage knifing, and had been stabbed twelve or thirteen times; some of the wounds extended completely through her torso. The physician who performed the autopsy later that day found that Mrs. Halling could have died either from the stab wounds, which severed her aorta, or from strangulation.

Ronald D. Churchill and Robert Mall lived together in the same apartment complex, one floor below the Halling apartment. During the investigation, the police discovered that the defendant had been seen walking around the building with his dog earlier that morning; he had at one time been within a few feet of the front door of the Halling apartment. Detective John Meire, investigating the homicide, went to the apartment occupied by Churchill and Mall about two hours after Mrs. Halling's body was discovered. He was making an area canvass. Churchill answered the door and in response to Meire's questions stated that he had been outside four or five times that morning, once quite close to the victim's apartment. He had seen and heard nothing unusual, and had seen no strangers. Mall stated that he had been sleeping and didn't see or hear anything.

Later, Detective Meire heard from another officer that during the 9:15 o'clock telephone conversation, Mrs. Halling asked her husband to bring some grape soda pop for the two men in apartment 114, Churchill and Mall. Meire, accompanied by Detective Allen Harris, returned to apartment 114 about 1:30 o'clock p.m. Churchill and Mall invited them to come inside, and they did so. After some conversation, Meire asked Churchill if they had any large knives in the apartment; defendant replied that they had some knives; the detective and Churchill went into the kitchen. Churchill opened a drawer and picked up a large knife. Meire took it from him, noted that it appeared similar in size to

the one used in the homicide, and asked Churchill if he would mind if the detectives took it with them. He said, "No." He also said that he had washed the knife that morning. Mall had worked the night before, arrived home at 8:15 o'clock a.m., and then slept until afternoon.

The knife and a doorknob from apartment 114 were subjected to laboratory examination. Human blood was found under the wooden handle of the knife; it matched the blood of the victim. A small amount of blood was found on the doorknob; it was consistent with Mall's blood, but the amount found was not large enough so that a full test could be run.

Michael Kelty, an experienced firearm and toolmark examiner with the Johnson County Criminalistics Laboratory, examined both the knife taken from the Churchill-Mall apartment, and the sternum of the victim. He expressed the opinion that the cuts in the victim's breastbone were made by the knife.

Churchill and Mall were arrested about 6:00 o'clock p.m. on February 1, two days after the homicide, and both were taken to the Overland Park police station where they were placed in separate rooms. Defendant was questioned by Detective Ellen Hanson. Around 9:00 o'clock p.m., another officer told Detective Hanson that Mall had not passed a polygraph examination. Churchill overheard this report, became very upset, and later asked to be left alone for a few minutes. He said he wanted to do the right thing. He couldn't understand why Mall didn't pass the polygraph test, and stated that he was certain that Mall had not committed the crime. Detective Hanson stepped out of the room. When she returned, Churchill told her that he had killed Mrs. Halling; that he wanted to do the right thing and that he did not want anybody else to take responsibility for what he had done. He then proceeded to confess the crime in considerable detail. The confession was written and was also tape recorded. The trial court determined that the statement was voluntary and admitted it into evidence. The tape recording was played for the jury at both of defendant's trials. The first trial resulted in a hung jury, the second in his conviction.

Defendant first contends that the trial court erred in overruling his motion to suppress the confession. He argues that it was inadmissible because it was given only after he was tricked or deceived into believing that his friend, Mall, had failed a poly-

graph examination; thus, he maintains that the confession was involuntary. The evidence establishes that defendant and Mall had a close relationship which apparently developed while both were in protective custody in the state penitentiary at Lansing, Kansas. This tends to support his contentions that his confession was motivated from a desire to protect Mall; that he was tricked into believing that Mall was in trouble because he had failed the polygraph examination, and was thus the prime suspect in the Halling murder.

During the questioning of defendant by Detective Hanson, defendant overheard a report from another officer that Mall had not passed the polygraph examination. This statement was essentially true; Mall had *not passed* the examination. The polygraph findings were deemed inconclusive by the technician who conducted the test because Mall had not had sufficient rest and sleep during the twenty-four-hour period prior to the taking of the examination. However, Mall had *not failed* the polygraph examination in the sense that one who has guilty knowledge fails such an examination.

Defendant, in support of his argument that the confession was involuntary, cites K.S.A. 60-460(*f*) which provides:

"*Confessions.* In a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged if, and only if, the judge finds that the accused when making the statement was conscious and was capable of understanding what he or she said and did, and that the accused was not induced to make the statement (1) under compulsion or by infliction or threats of infliction of suffering upon him, her or another, or by prolonged interrogation under such circumstances as to render the statement involuntary, or (2) by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same;   . . ."

The defendant concedes that this is not a case involving an explicit threat or promise which caused him to make a false confession. He contends, however, that the police, by implication, indicated that Mall would be held responsible for the murder. It is clear from the record that no threats or promises of any kind were made by the police. We discussed the general rules relating to the voluntariness of confessions in the light of K.S.A. 60-460(*f*)(2) in *State v. Kanive*, 221 Kan. 34, 37-38, 558 P.2d 1075 (1976). We said:

"In considering the effect of a promise made by the police to an accused during an interrogation various factors have been recognized as worthy of consideration in determining the voluntariness of a subsequent confession. To render such a confession involuntary it is generally held that the promise must concern action to be taken by a public official, that the promised action must be such as would likely cause the accused to make a false statement to obtain the benefits of the promise and the promise must be made by a person whom the accused reasonably believed to have the power or authority to execute the same. (*State v. Stuart,* 206 Kan. 11, Syl. 4, 476 P.2d 975; *State v. Harwick,* 220 Kan. 572, 576, 552 P.2d 987; K.S.A. 60-460[*f*][2].) In addition it is generally recognized that a promise of some collateral benefit is less likely to induce a false confession. In the case of a promise concerning a collateral benefit, as distinguished from a promise to relieve the accused of some consequence of the crime charged, a more stringent test is applied. To hold that a promise of some collateral benefit renders a confession involuntary it must appear that the collateral benefit promised was of a nature calculated to produce a confession irrespective of its truth or falsity. (3 Wharton's Criminal Evidence, 13th Ed., § 680, p. 464, n. 11; 29 Am. Jur. 2d, Evidence, § 561,. p. 619; 23 C.J.S., Criminal Law, § 825 d, p. 214.)

"We have previously considered the probable effect of a promise of collateral benefits. In *State v. Pittman,* 199 Kan. 591, 433 P.2d 550, there was evidence that the chief of police told the defendant during questioning that if he was holding back through fear of what would happen to his family, he (the chief) would see that the proper authorities were contacted and the family would be cared for. This court held:

'. . . This is not the sort of promise, either in phraseology or content, which would overcome a defendant's free and unfettered will. . . .' (p. 596.) See also *Baker v. State,* 204 Kan. 607, 464 P.2d 212.

"A confession induced by a promise of a collateral benefit, with no assurance of benefit to accused with respect to the crime under inquiry, is generally considered voluntary and admissible in evidence, unless the circumstances surrounding the promise of the collateral benefit were such as to render the confession untrustworthy or the promise could reasonably be calculated to produce a confession irrespective of its truth or falsity."

In this case the "collateral benefit" was that Mall would not be charged with the murder. The police, however, made no promises to the defendant regarding the treatment of Mall, and said nothing to the defendant about what they planned to do. Defendant's conclusion that things would go better for Mall if he (Churchill) told the truth about the crime was not induced by any promises or threats made by the police. The mere statement that Mall had not passed the polygraph examination certainly was not a promise or device "calculated to produce a confession irrespective of its truth or falsity." The fact that the defendant may have been motivated to confess to the crime in order to remove his friend from suspicion is not sufficient to render the confession

involuntary. The trial court found the confession to be voluntary and admissible. There is no evidence of police coercion or promises in the record which would render that conclusion incorrect.

The Nebraska Supreme Court in *State v. Stevenson & Jackson,* 200 Neb. 624, 264 N.W.2d 848 (1978), was faced with a situation where the police told one arson suspect that his confederate had told them the truth about the fire. He had not. A second suspect, upon hearing the statement, confessed to setting the fire. The court held that the confession was admissible. It said:

"The general rule is that police deception is not sufficient to make an otherwise valid confession inadmissible, unless it is such as to produce a false or untrustworthy confession. . . . The investigators simply told Jackson that Stevenson had told them the truth about the origin of the fire. There is no evidence of any threats or coercion and no evidence whatever that the form of the deception suggested the answer. The trial court was correct in concluding that the deception did not render the confession inadmissible." 200 Neb. at 629.

We conclude that Churchill's confession was voluntary, and was properly admitted into evidence.

The defendant relies upon *United States v. Remolif,* 227 F. Supp. 420, 424, (D. Nev. 1964), and *Lisenba v. California,* 314 U.S. 219, 86 L.Ed. 166, 62 S.Ct. 280 (1941). *Lisenba* involved threats, physical abuse, and continued and prolonged police interrogation. We have examined both opinions and find them distinguishable on the facts and not persuasive.

Defendant next contends that the trial court erred in admitting, over objection, the opinion testimony of Michael Kelty, the firearm and toolmark examiner. It is well established that the qualifications of expert witnesses and the admissibility of expert testimony are matters which lie within the sound discretion of the trial court; its rulings upon such testimony will not be disturbed on appeal, unless the appellate court finds an abuse of discretion. K.S.A. 60-456; *State v. Bright,* 229 Kan. 185, 190, 623 P.2d 917 (1981); *State v. Reed,* 226 Kan. 519, Syl. ¶ 1, 601 P.2d 1125 (1979); *Curtis v. Freden,* 224 Kan. 646, 585 P.2d 993 (1978); *Spraker v. Lankin,* 218 Kan. 609, 613, 545 P.2d 352 (1976).

Mr. Kelty had been employed for many years as a toolmark and firearms examiner; he had made hundreds of toolmark comparisons and had testified frequently as an expert during that period of time. He testified that he had not previously performed tests to determine whether marks upon the human body were made by a

given tool, but he testified that toolmark examinations in human tissue were conducted by the same procedures and governed by the same principles applicable generally in toolmark examinations, and that the procedure used was acceptable in his profession. It would appear from the record that he has the requisite skill and training to perform the tests, and that the methods used were reliable. The defendant presented expert testimony to the jury in order to call into question Kelty's methods and conclusions. The witness's experience or lack of experience in previously performing similar examinations goes to the weight of the testimony, not to its admissibility. See *State v. Peoples,* 227 Kan. 127, 133, 605 P.2d 135 (1980). We hold that the trial court did not abuse its discretion in admitting the testimony.

Next, defendant contends that the trial court erred in admitting into evidence his prior rape conviction in Sedgwick County. A certified copy of the journal entry of judgment in the Sedgwick County case was received in evidence. Defendant first argues that there was no proper foundation to identify the prior conviction, and that it was therefore hearsay. We have examined the exhibit and find that it was certified as a true and correct copy of the original instrument by a deputy clerk of the Sedgwick County District Court, as required by K.S.A. 60-465(3). A witness testified that defendant here was the same person as the defendant in the Sedgwick County case. We conclude that the exhibit was admissible under the cited statute and K.S.A. 60-460(*o*).

Appellant next argues that the prior crime was inadmissible under K.S.A. 60-455. That statute, by its express language, makes evidence of other crimes inadmissible to prove an accused's *disposition* to commit a crime; the evidence is admissible only to prove one or more of the eight material factors specified in the statute. Motive and identity are two of the specified factors. The rules relating to the admissibility of other crimes evidence to prove identity are succinctly set forth in *State v. Bly,* 215 Kan. 168, 177, 178, 523 P.2d 397 (1974):

"Where a similar offense is offered for the purpose of proving *identity,* the evidence should disclose sufficient facts and circumstances of the other offense to raise a reasonable inference that the defendant committed both of the offenses. In other words to show that the same person committed two offenses it is not sufficient simply to show that the offenses were violations of the same or a similar statute. There should be some evidence of the underlying facts showing the manner in which the other offense was committed so as to raise a reasonable

inference that the same person committed both offenses. As pointed out by Mr. Justice Kaul in *State v. Johnson,* 210 Kan. 288, 502 P.2d 802:

" 'The quality of sameness *is* important when pondering the admission of other crimes to prove identity.' " (p. 294.) (Emphasis supplied.)

. . . .

"'To prove identity it is necessary to introduce evidence of the underlying facts and circumstances to show that the crimes were committed in a similar manner so as to raise a reasonable inference that the person who committed one crime committed the other."

Before evidence of the defendant's rape conviction was admitted into evidence, the trial court conducted a hearing pursuant to defendant's motion in limine to suppress the prior crimes evidence. Detective Hanson testified about the similarities between the two offenses. She did not have first-hand knowledge of the Wichita crime, but testified from investigative reports supplied to her by the Wichita police department. No Wichita officer appeared at the hearing to determine the admissibility of the prior crimes evidence. Although this could have been done, we find no error in the procedure followed. The evidence presented disclosed a large number of similarities as well as dissimilarities. Both victims were young, white females living in second floor apartments; both crimes were committed in the morning hours; and in both cases a large, wooden-handled knife was wielded by the accused. The young woman in Wichita was threatened with strangulation and with the knife; Mrs. Halling's body bore bruises in the neck region, and she was actually stabbed. Many other similarities and dissimilarities have been called to our attention by industrious counsel.

The defendant points out that the prior conviction was for rape, while in the case at hand there was no evidence of rape or attempted rape. Both crimes, however, were crimes of violence committed against young women in their homes. In *State v. Gourley,* 224 Kan. 167, 578 P.2d 713 (1978), we found that evidence of the crimes of attempted rape and aggravated burglary was properly admitted by the trial court on the issue of identity where the crime charged was first degree murder and aggravated burglary. In both instances, the defendant had attacked a young woman alone in her home, choked his victims with an electrical cord, and sought or forcibly took guns and jewelry. See also *State v. Hanson,* 221 Kan. 635, 645, 562 P.2d 51 (1977), where evidence of an aggravated assault was held to have been properly admitted to show identity in the trial of a first degree murder case.

Detective Hanson testified, and it was conceded, that the defendant was the same Ronald D. Churchill who was convicted in the Sedgwick County case. The trial court gave an appropriate instruction, limiting the jury's consideration of the other crimes evidence to motive and identity. It does not appear that motive was substantially in issue. See *State v. Craig,* 215 Kan. 381, 524 P.2d 679 (1974); *State v. Myrick & Nelms,* 228 Kan. 406, 616 P.2d 1066 (1980); and *State v. Carty,* 231 Kan. 282, 644 P.2d 407 (1982). We conclude that the similarities between the rape and the murder provide sufficient probative value to be relevant on the issue of identity, and that the trial court did not err in admitting evidence of the prior crime on the identity issue. Since it was relevant on that issue, error in admitting it to show motive was not prejudicial.

As we have already noted, the trial court heard the State's evidence with reference to the Wichita conviction in camera. The court then ruled that evidence of that offense was admissible for limited purposes, and the journal entry of conviction was offered and received in evidence upon trial. The State, however, did not call any Wichita police officer or anyone familiar with the facts of the Wichita conviction, and no evidence of the details of that offense were presented to the jury. This was error, but no objection to the reception of the journal entry into evidence was made on that ground. Evidence of the details of the rape, including a description of the large knife used, would certainly have been unfavorable to the defendant and its omission does not constitute prejudicial error.

The journal entry of the rape conviction, which was admitted in evidence, included a statement that Churchill had previously been convicted of burglary and larceny, and that he was sentenced as an habitual criminal. The State concedes that this was improper; that it was inadvertent; that both counsel for the State and the defense saw the journal entry before it was admitted; and that the State intended to excise those portions of the journal entry before it was introduced in evidence, but failed to do so. The defense had a continuing objection to the admission of the journal entry on K.S.A. 60-455 grounds, but the defense did not make a specific objection to the journal entry on the issues now argued. There was no specific objection as required by our

long-standing contemporaneous objection rule, K.S.A. 60-404, and the trial court was not afforded an opportunity to correct the error. The evidence before the jury in this case clearly established that the defendant and Mall were long time close friends, that Mall had recently been released from the Kansas State Penitentiary after serving a fifteen-year-to-life term, and that Mall was approximately twenty years older than the defendant. Much of this evidence was brought out by the defense. The jury could not have failed to be aware that Churchill, too, had been confined in the penitentiary. The prior offenses described in the journal entry were nonviolent. Under all of the attendant circumstances, we find no prejudicial error.

For his next point the defendant contends that the trial court erred in admitting a statement made by Robert Mall, explaining a small cut on his hand, because the statement was hearsay. At the time Mall was arrested, one of the officers observed a small abrasion on his right hand. It appeared to be nearly healed. Both Mall and Churchill told the officers that Mall had been walking with their German Shepherd puppy and that it had nipped him on the hand. The defendant objected to the admission of Mall's statements as hearsay because Mall was not available as a witness at trial. The trial court admitted the testimony because the cut or injury did not appear fresh, because Mall was not available to testify at the time of trial, and under K.S.A. 60-460(d)(3), which makes hearsay admissible on the grounds of necessity. It reads:

"Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible except:

. . . .

"(d) . . . . A statement . . . (3) if the declarant is unavailable as a witness, a statement narrating, describing or explaining an event or condition which the judge finds was made by the declarant at a time when the matter had been recently perceived by the declarant and while his or her recollection was clear, and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort; . . ."

As previously stated, a small amount of blood compatible with that of Mall was found on the doorknob. This statement would tend to explain the presence of Mall's blood on the knob. The trial judge made the findings required by the quoted statute, and exercised his discretion in admitting the statement. Since Mall's explanation of the abrasion—which was said to be nearly healed

at the time of his arrest, two days after the murder—was the same explanation given to the officers by Churchill and received in evidence, we find no error.

Finally, defendant contends that the trial court erred in denying his motion for new trial due to the various errors in the proceedings heretofore described. In view of our rulings upon defendant's claims of error, we find that the trial court did not err in overruling the motion for new trial.

The judgment is affirmed.