No. 57,979

STATE OF KANSAS, *Appellee*, v. MICHAEL R. WAUGH, *Appellant*.

(712 P.2d 1243)

Opinion filed January 17, 1986.

*Chris Biggs*, of Junction City, argued the cause and was on the brief for appellant.

*Keith D. Hoffman*, county attorney, argued the cause and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: The defendant, Michael R. Waugh, appeals from his conviction of first degree felony murder in the Dickinson County District Court. Waugh alleges (1) that the district court failed to suppress his confession, which he claims was involuntarily given because the police method of questioning created

psychological pressure that induced him to confess against his will, and (2) that he was deprived of his constitutional right to an attorney.

John Edward "Friday" Longbine, an 81-year-old man, was reported missing to the Herington Police Department on March 15, 1984. During their investigation, the police determined that on the night of March 15 both Waugh and Longbine had been in the Spot Tavern and that on the same night Longbine had been seen getting into an automobile matching the description of the vehicle owned by the defendant. The police investigation into Longbine's disappearance focused on the defendant, Michael Waugh.

On Saturday, March 24, 1984, at approximately 3:30 p.m., John Barker, an investigator for the Dickinson County Attorney's office, went to Waugh's residence. Only Waugh and his daughter were present in the house at the time. Barker read Waugh his *Miranda* rights. Barker then asked Waugh if he could interview him on tape and requested that the defendant sign a waiver to allow the search of his automobile. Waugh consented to both.

The interview lasted between 20 and 30 minutes. No incriminating statements were made by Waugh at that time. Later, bloodhounds were used to search Waugh's vehicle and they "hit" upon the scent of Friday Longbine. Waugh was not informed of that fact at the time.

Barker, after leaving the Waugh residence, discovered his tape recorder had failed to work. He obtained another tape recorder and made arrangements with the Herington Police Department to interrogate Waugh at the police station. Barker then returned to the Waugh residence and requested that Waugh come to the police station for an interview. Waugh complied with the request after arrangements were made for an officer to babysit with Waugh's daughter at the police station.

Waugh and his daughter arrived at the police station at about 5:15 p.m. Waugh was led into the interrogation room where Barker instructed him to sit. Waugh was again given his *Miranda* rights. Barker interrogated Waugh for approximately one hour and 15 minutes. Until the end of the interview, Waugh denied any knowledge of the whereabouts of Friday Longbine or any knowledge of his disappearance. At the end of the interview, Waugh admitted that Longbine had been in his car and had had a

heart attack. Waugh said he had become frightened and dumped Longbine's body in the Kansas River on the Fort Riley Military Reservation.

Following this interrogation, Waugh was taken to another room for a videotaped interview. After Waugh again was advised of his *Miranda* rights, he repeated his previous statement.

Waugh was then transported to Fort Riley. During the ride to Fort Riley, Waugh was notified that he was under arrest, although he was not specifically told for what he was arrested. Waugh took the authorities to an area where he indicated the body had been dumped. He was then returned to the Dickinson County Jail.

During the ride back and several times during the night, Waugh requested that he be allowed to contact his wife. He was denied his requests. Sometime during the evening, Waugh, to prove that his story of Friday's death by heart attack was true, agreed to submit to a polygraph test.

The following day, Sunday, March 25, Waugh was taken to the Abilene Police Station where the test was administered by Bruce Howell. It took approximately two hours to administer the test. Following the test, Howell explained to Waugh that the test results indicated Waugh was truthful in admitting he was an alcoholic, but not truthful when discussing what had occurred on March 15 with Mr. Longbine. Howell repeatedly told Waugh that he wanted to help him with his problem. Twenty minutes later and after numerous such statements by Howell, Waugh told Howell that he had in fact killed Longbine and disposed of the body in a lake.

Howell then left the room and returned with Barker. At that point Waugh requested an attorney. Barker discontinued questioning Waugh about the facts of the case. Instead, he asked Waugh if he would show them where Waugh had hidden the body. Waugh agreed.

On Monday, March 26, 1984, Waugh wrote a letter to the jailer requesting to speak with Barker without an attorney present. It was then arranged to bring Waugh before a magistrate for waiver of counsel. At the hearing before the magistrate, Waugh, after again being informed of his *Miranda* rights, told the judge that he wanted an attorney, but did not want one at that time. Following the hearing, Waugh was taken to an area near

Herington Lake where he pointed out to law enforcement officers where he had dumped Longbine's body.

Waugh then requested to see his wife again. Barker told him that could be arranged after another statement was made. Waugh was taken to the Herington Police Department where he was again given his rights and a videotaped confession was taken from him. He was then allowed to contact his wife. On Tuesday, March 27, 1984, a complaint was filed and counsel was appointed for the defendant.

Prior to trial, the defendant filed a motion to suppress his confession. A suppression hearing was held on September 18 and 28, 1984. The court held that the results of the polygraph examination would not be admissible, and that once Waugh announced that he desired a lawyer on March 26, the portion of the videotape following that request would not be permitted to be viewed by the jury. The court also held that the incriminating statements made by the defendant after his appearance before a judge to waive counsel would be allowed, based on what the court found to be a valid waiver.

Later, prior to trial, the defendant also filed a motion to suppress certain physical evidence, including the body of the decedent, which had been located as a result of the defendant's incriminating statements. Based on the Court's previous ruling allowing the confession, the motion was denied.

Waugh was convicted of felony murder by a jury. He now appeals.

The defendant contends that his confession was involuntarily obtained because he was subjected to psychological coercion which included being held incommunicado and being subjected to deceptive practices by the interrogators.

The U.S. Constitution, under the Fifth Amendment, guarantees the accused the privilege against self-incrimination from statements that are not freely and voluntarily given or are given under the threat of force or compulsion. Procedural safeguards protect the exercise of the privilege against self-incrimination from the coercive effects of custodial interrogation. Prior to custodial interrogation, law enforcement officers must advise a suspect that he has the right to remain silent, that his statements may be used against him at trial, and that if he cannot afford an attorney one will be appointed to represent him. If the suspect

indicates in any manner either prior to or during questioning that he wishes to remain silent, interrogation must cease and may not recommence until the suspect knowingly, intelligently and voluntarily waives his right to silence. *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966).

K.S.A. 22-3215(4) places the burden of proving that a confession or admission is admissible on the prosecution. In the present case, the trial court, after a hearing, determined Waugh's confessions were voluntary. When a trial court determines at a hearing that a defendant's extrajudicial statement was freely, voluntarily and intelligently given and admits the statement into evidence at trial, the appellate court will not reverse such determination if it is supported by substantial competent evidence. *State v. Lilley,* 231 Kan. 694, Syl. ¶ 6, 647 P.2d 1323 (1982).

When determining the voluntariness of a confession, one views the totality of the circumstances, including: (1) the duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect and background; and (4) the fairness of the officers in conducting the interrogation. *State v. Newfield,* 229 Kan. 347, 623 P.2d 1349 (1981).

Under the Fourteenth Amendment due process voluntariness test, a case-by-case evaluation approach is employed to determine whether coercion was impermissibly used in obtaining a confession. Coercion in obtaining a confession from an accused can be mental as well as physical. In determining the voluntariness of a confession of crime, the question in each case is whether the defendant's will was overborne at the time of the confession; if so, the confession cannot be deemed the product of a rational intellect and a free will. *State v. Soverns,* 215 Kan. 775, 777, 529 P.2d 181 (1974).

Waugh contends that the "good guy approach" used by Barker during the interrogation on March 24 and by Howell during the polygraph examination were forms of psychological coercion. Waugh cites *Leyra v. Denno,* 347 U.S. 556, 98 L.Ed. 948, 74 S.Ct. 716 (1954), for support. In that case, a state-employed psychiatrist posed numerous subtle and suggestive questions to the defendant until he confessed. The facts of *Leyra,* however, differ from the present case. The defendant in *Leyra* had been submitted to questioning for ten to fourteen hours a day for four

days. He was suffering from an acutely painful attack of sinus, and the police had promised to get a physician to help. The psychiatrist, who was trained in hypnosis, was introduced to the defendant as a physician. After nearly an hour and a half of questioning, during which the psychiatrist assured the defendant that he had done no moral wrong and would be let off easy, the defendant confessed. The Supreme Court found that the confession was coerced. For a comprehensive discussion of psychological coercion see *Miranda v. Arizona*, 384 U.S. 436, and *Miller v. Fenton*, 741 F.2d 1456 (3rd Cir. 1984).

Here, Waugh knew that he was being questioned by an investigator for the police and later by the polygraph examiner. He had not been repeatedly questioned for hours and days. No threats or promises were made by either man. While they encouraged him to tell the truth, there was no positive promise of a benefit. The transcript of the interview at the police station shows that Barker repeatedly told Waugh that he believed that Waugh was lying and that Waugh would make it easier on himself by talking. Barker went so far as to tell Waugh that "I just want to go out there and get Friday and give him a Christian burial." Neither the fact that the interrogation and the polygraph examination were conducted in a sympathetic manner rather than confrontational manner, nor the fact that it is the practice of the police to encourage a defendant to confess, automatically requires that a statement given under such circumstances be found to be one coerced in violation of the suspect's rights.

The defendant next contends that his confession was improperly induced by promises of help made by officers. He cites *Robinson v. Smith*, 451 F.Supp. 1278 (W.D.N.Y. 1978). In that case, a detective advised the defendant that "if he told the truth and told us the facts that he would probably receive the benefits of any leniency that may come to him in the courts." 451 F.Supp. at 1290. The Robinson court found that the assurance by police interrogators that they would help the defendant and that he could help himself by confessing were clearly misleading. The court found that the police promises of benefit were an important factor which compelled the defendant to confess.

In the present case, neither Barker nor Howell made any promises of leniency. Both discussed Waugh's alcohol problem with him and suggested that there were places where he could

get help for it. Both suggested it would be to his and his family's benefit to tell the truth and get help. The offers of help in this instance were of a collateral benefit, and were not offered to relieve the accused of some consequence of the crime charged. To hold that a promise of some collateral benefit renders a confession involuntary, it must appear that the collateral benefit promised was of such a nature it could reasonably be calculated to produce a confession irrespective of its truth or falsity. *State v. Churchill*, 231 Kan. 408, Syl. ¶ 1, 646 P.2d 1049 (1982). The collateral benefit in this case was not such that it would have produced a false or untrustworthy confession.

The defendant contends that the fact that he was not allowed to see his wife until he showed the police where the body was located added to the coercive atmosphere which resulted in his confessing. He cites *Haynes v. Washington*, 373 U.S. 503, 10 L.Ed.2d 513, 83 S.Ct. 1336 (1963), as support for his argument. In *Haynes*, the defendant was found guilty of robbery after his written and signed confession was admitted into evidence. He made the confession 16 hours after he was arrested, during which time he was refused permission to call his wife or an attorney and was repeatedly told that he would not be allowed to call unless and until he "cooperated" with police and gave them a written and signed confession. The court said that the confession was not voluntary.

While many of the facts in *Haynes* are similar to those in the present case, permission for Waugh to see his wife was not conditioned on his confessing or disclosing the location of the body nor was it offered as an inducement for procuring his cooperation. He was not subjected to lengthy and uninterrupted interrogation. Generally, the Supreme Court has found that under less extreme circumstances, as where the detention has only been for a few days or the questioning lasted only a few hours, exclusion of the confession has occurred only when it was also shown that the defendant was especially susceptible to coercion. See *Culombe v. Connecticut*, 367 U.S. 568, 6 L.Ed.2d 1037, 81 S.Ct. 1860 (1961); *Haley v. Ohio*, 332 U.S. 596, 92 L.Ed. 224, 68 S.Ct. 302 (1948).

Waugh's purpose for talking with the officers cannot be ignored when reviewing the circumstances of his statements. When first questioned by investigators, Waugh denied any con-

tact with Friday on the night he had disappeared. When later informed that during the night Friday vanished witnesses had seen them together in a tavern, that a witness had observed Friday getting into a car similar to the defendant's, and that several days later bloodhounds had detected Friday's scent inside Waugh's automobile, Waugh changed his story. Waugh then stated that after Friday had died of natural causes that night he had become frightened and hid the body in the river. In an effort to hide the fact that he had killed Friday to obtain his money and then disposed of the body in a lake, the defendant agreed to take a polygraph test. When the polygraph examination revealed that Waugh had lied, he admitted the true story of what occurred that night. The defendant's calculated risk had failed:

The defendant next claims that both his Fifth and Sixth Amendment rights to counsel were violated. He contends that he was taken into custody during the first interview at the police station and that the *Miranda* warnings given at that time were inadequate. He claims that in every waiver form, he was improperly informed that he had only a right to stop answering questions until he talked to a lawyer. Waugh contends he believed that once he talked to a lawyer he no longer had the right to remain silent.

*Miranda* requires that a suspect, before any "custodial interrogation," must be warned in clear and unequivocal terms (1) that he has a right to remain silent, (2) that any statement that he does make may be used as evidence against him, (3) that he has a right to consult with, and have present prior to and during interrogation, an attorney, either retained or appointed, and (4) that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires.

In *California v. Prysock,* 453 U.S. 355, 69 L.Ed.2d 696, 101 S.Ct. 2806 (1981), the court noted that it "has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given" and that, "[q]uite the contrary, *Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures." p. 359. The *Prysock* court also said that where a defendant "was told of his right to have a lawyer present prior to and during interrogation" and also of his right to have a lawyer appointed at no cost if he could not afford one, these warnings collectively "conveyed to respondent his right to have

a lawyer appointed if he could not afford one prior to and during interrogation." p. 361.

In the present case, Waugh was advised at his home, at the police station, prior to the polygraph examination, prior to being questioned by police officers and when brought before the magistrate to waive his right to an attorney that he had a right to counsel. The investigator and the polygraph operator both carefully read and explained to Waugh his rights. After the verbal warnings, Waugh also signed a written waiver. They asked Waugh if he understood what was said and Waugh stated that he understood his rights. After reviewing the record, we find that each of the warnings properly conveyed to Waugh his rights under *Miranda*.

Waugh also contends that his right to counsel was violated when he was not provided an attorney at the March 26 hearing before the magistrate judge. In *Brewer v. Williams,* 430 U.S. 387, 398, 51 L.Ed.2d 424, 97 S.Ct. 1232, *reh. denied* 431 U.S. 925 (1977), the Supreme Court declared that "the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him— 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " The court also recognized that the right to counsel could be waived, and that such waiver would not inevitably necessitate the participation of the defendant's lawyer.

The right to counsel under the Sixth Amendment does not attach prior to the initiation of adversary judicial proceedings against an accused. Where a case is still in the investigative stage, or in the absence of a person being charged, arrested or indicted, such adversary proceedings have not yet commenced, and thus no right to counsel has attached. *State v. Irving,* 231 Kan. 258, 262, 644 P.2d 389 (1982). The Sixth Amendment guarantees attach only after the initiation of judicial criminal proceedings against an individual. *State v. Estes,* 216 Kan. 382, 385-386, 532 P.2d 1283 (1975).

An arrest does not, in itself, initiate the criminal proceeding. Under the Kansas law it is (1) the filing of a complaint with a magistrate (K.S.A. 22-2301) or (2) the return of an indictment by the grand jury and the filing of an information that triggers the

initiation of the criminal proceeding. (K.S.A. 1984 Supp. 22-2303.) At that time the right to an attorney attaches to the person so charged. No judicial proceedings were commenced against Waugh until March 27, 1984, when the complaint was filed. At the time the hearing was conducted, the magistrate had no jurisdiction to appoint an attorney to represent Waugh until after a complaint had been filed. Since a complaint had not been filed, no judicial proceedings had begun against the defendant and the magistrate was no more than a witness to the defendant's waiver of his right to an attorney. The defendant's Sixth Amendment right to counsel had not yet attached.

The defendant contends that if the confession is inadmissible, then the evidence, particularly the evidence of the discovery of the body found as a result of the confession, should be suppressed.

In the present case, after the polygraph test indicated he had lied about how Friday had died, Waugh admitted that he had struck and killed Friday with a tire iron and disposed of the body in a lake.

A person in custody is able to assert his right to remain silent at any time he is being interrogated and may selectively assert his right to remain silent by indicating that he will not respond to questions or will respond to some questions but not to others. *United States v. Thierman,* 678 F.2d 1331, 1335 (9th Cir. 1982). Most courts, including Kansas, do not construe *Miranda* as creating a per se rule against further questioning if the person in custody initiates a conversation with police officers. Once a valid waiver is made, questioning by law enforcement officers may continue until the accused revokes his waiver.

Waugh initiated further conversation with the law enforcement officers, giving up his right to remain silent. His statements made after his appearance before the magistrate and the evidence obtained as a result of those statements, were properly admitted by the trial court.

Affirmed.

HERD, J., dissenting: As in the case of *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), we are confronted with the question of the restraints our society must observe to comply with state and federal constitutional guarantees against self-incrimination in prosecuting individuals for crime.

As Justice Stevens wrote in his concurring opinion in *Brewer v. Williams,* 430 U.S. 387, 415, 51 L.Ed.2d 424, 97 S.Ct. 1232 (1977): "Nothing that we write, no matter how well reasoned or forcefully expressed, can bring back the victim of this tragedy." However, the heinous nature of the crime should not dim our view of the constitutional principles involved. They live on after us and affect everyone. The issue here is the voluntariness of a confession. The legal standard for voluntariness is whether the confession is "the product of a rational intellect and a free will." *Blackburn v. Alabama,* 361 U.S. 199, 208, 4 L.Ed.2d 242, 80 S.Ct. 274 (1960). *Blackburn* also held that a confession may be extracted by psychological methods as surely as by physical abuse. In the case of psychological coercion a court should consider the intensity of the psychological pressure employed and the potential for deceit arising as a result of the accused's susceptibility to such pressure, measured by his maturity, education, intelligence, experience and physical condition.

In *State v. Newfield,* 229 Kan. 347, 357, 623 P.2d 1349 (1981), we set forth some of the factors and principles to be considered in determining the voluntariness of an accused's confession:

"In determining the voluntariness of a confession, it is to be viewed in light of the totality of circumstances, including the following factors: (1) The duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect and background; and (4) the fairness of the officers in conducting the interrogation. Essential to the inquiry is the determination that the statement was the product of the free and independent will of the accused. If the accused was not deprived of his free choice to admit, deny or refuse to answer, the statement may be considered voluntary. [Citations omitted.] The burden of proving the statement was voluntary rests with the State. *State v. Kanive,* 221 Kan. at 35. When the trial court conducts a preliminary inquiry, determines the confession to be voluntarily and intelligently given, and admits the statement into evidence at trial, the findings of the trial court are to be upheld on appellate review if supported by substantial, competent evidence. *State v. Levier,* 226 Kan. 461, 462, 601 P.2d 1116 (1979)."

With the foregoing rules in mind and with recognition that we regularly reaffirm our dedication to the foregoing principles, let us review the undisputed facts in this case.

Michael R. Waugh came under suspicion as the possible murderer of John Edward Longbine. Prior to interrogation, Waugh was properly administered the *Miranda* warning. He gave the officers some untrue but inculpatory statements wherein he admitted he had the victim in his car and that he disposed of the

body. He was then arrested and consented to submit to a polygraph test to prove the truth of his prior statements. The test took two hours. Immediately after the test, Bruce Howell, the polygraph operator, interrogated Waugh. The interrogation took place in a jail setting. Mr. Howell advised Waugh he wanted to help him. He stated he knew Waugh had alcohol problems for which he needed professional assistance. Howell assured Waugh he did not really blame him for the crime but blamed alcohol. Howell then said there were two areas of the polygraph test which showed Waugh was not truthful. After repeated assurances by Howell that the only reason for the interview was to help Waugh and that he was interested in finding Longbine's body to give it a Christian burial, Waugh confessed.

In the course of the interrogation, both before and after the arrest, Waugh was denied the privilege of talking to his wife.

*Miranda* contains a detailed discussion of this type of interrogational atmosphere. It states:

"Again we stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have stated before, 'Since *Chambers v. Florida,* 309 U.S. 227 [, 84 L.Ed. 716, 60 S. Ct. 472 (1940)], this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.' *Blackburn v. Alabama,* 361 U.S. 199, 206[, 4 L.Ed.2d 242, 80 S.Ct. 274] (1960). Interrogation still takes place in privacy. Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms. A valuable source of information about present police practices, however, may be found in various police manuals and texts which document procedures employed with success in the past, and which recommend various other effective tactics. These tests are used by law enforcement agencies themselves as guides. It should be noted that these tests professedly present the most enlightened and effective means presently used to obtain statements through custodial interrogation. By considering these texts and other data, it is possible to describe procedures observed and noted around the country.

"The officers are told by the manuals that the 'principal psychological factor contributing to a successful interrogation is *privacy*—being alone with the person under interrogation.' The efficacy of this tactic has been explained as follows:

'If at all practicable, the interrogation should take place in the investigator's office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. In his own office, the investigator possesses all the

advantages. The atmosphere suggests the invincibility of the forces of the law.'

"To highlight the isolation and unfamiliar surroundings, the manuals instruct the police to display an air of confidence in the suspect's guilt and from outward appearance to maintain only an interest in confirming certain details. The guilt of the subject is to be posited as a fact. The interrogator should direct his comments toward the reasons why the subject committed the act, rather than court failure by asking the subject whether he did it. Like other men, perhaps the subject has had a bad family life, had an unhappy childhood, had too much to drink, had an unrequited desire for women. The officers are instructed to minimize the moral seriousness of the offense, to cast the blame on the victim or on society. These tactics are designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty. Explanations to the contrary are dismissed and discouraged." 384 U.S. at 448-50.

The techniques utilized by the investigators in the present case were clearly designed to deprive the defendant of every possible psychological advantage. The interrogation, with its inaccurate statements and representations by the interrogating officer, coupled with the jail-like setting, overcame the will of Waugh. By no stretch of imagination can it be said Waugh's statement was a product of an essentially free and unconstrained choice. It was the product of implied promises to help him, cajolery, and inaccurate assertions of the interrogator's purpose. The officer was not interested in "helping" Waugh, nor was he interested in obtaining a Christian burial for Mr. Longbine. He was interested only in overcoming Waugh's will and obtaining his confession.

Under these facts I find no evidence to support the trial court's findings and am convinced Waugh's will was overcome, rendering his confession involuntary.

In cases such as this, where a terrible crime has been committed and there is probable cause the accused committed the crime, our natural inclination is to believe we must fight fire with fire and use any means available to rid society of this threat. This is the rule of expediency, which is exactly the practice the rule of law was designed to eliminate. Let us again look at *Miranda*, at p. 460, where the Court gave an excellent review of the privilege, stating:

"Thus we may view the historical development of the privilege as one which groped for the proper scope of governmental power over the citizen. As a 'noble principle often transcends its origins,' the privilege has come rightfully to be recognized in part as an individual's substantive right, a 'right to a private enclave where he may lead a private life. That right is the hallmark of our democracy.' *United States v. Grunewald*, 233 F.2d 556, 579, 581-82 (Frank, J.,

dissenting), rev'd, 353 U.S. 391 (1957). We have recently noted that the privilege against self-incrimination—the essential mainstay of our adversary system—is founded on a complex of values, *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55-57, n. 5[, 12 L.Ed.2d 678, 682, 84 S.Ct. 1594] (1964); *Tehan v. Shott,* 382 U.S. 406, 414-415, n. 12[, 15 L.Ed.2d 453, 86 S.Ct. 459] (1966). All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' 8 *Wigmore, Evidence* 317 (McNaughton rev. 1961), to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. *Chambers v. Florida,* 309 U.S. 227, 235-238[, 84 L.Ed.716, 60 S.Ct. 472] (1940). In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' *Malloy v. Hogan,* 378 U.S. 1, 8[, 12 L.Ed.2d 653, 84 S.Ct. 1489] (1964)."

This case is a classic example of violation of an accused's privilege against self-incrimination. I would reverse and remand for a new trial with directions to suppress all of Waugh's statements made after his arrest and the evidence found as a result thereof.