The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

James Stewart GENRICH, Defendant–Appellant.

No. 93CA1079.

Colorado Court of Appeals, Div. II.

May 16, 1996.

As Modified on Denial of Rehearing June 20, 1996.

Certiorari Denied Nov. 25, 1996.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Matthew S. Holman, Assistant Attorney General, Denver, for Plaintiff–Appellee.

Cherner and Blackman, Barbara S. Blackman, Colorado, for Defendant–Appellant.

Opinion by Judge RULAND.

Defendant, James Stewart Genrich, appeals from the judgments of conviction entered upon jury verdicts finding him guilty of

three counts of use of explosives to commit a felony, third degree assault, and two counts of extreme indifference homicide. We affirm.

Defendant's convictions arose out of three different incidents in which pipe bombs exploded and injured one victim and killed two other victims. After a lengthy and extensive investigation that included various suspects, law enforcement officers focused on defendant and he was ultimately charged. The investigating officers included both local police officers and agents of the Federal Bureau of Alcohol, Tobacco, and Firearms (BATF).

## I

■ Defendant first contends that the trial court committed a gross abuse of discretion in not conducting a hearing in advance of the trial to determine whether the toolmark identification testimony offered by the prosecution was sufficiently reliable to warrant admission in evidence. According to defendant, a pretrial hearing was required regardless whether CRE 702 or the test established in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), governed admission of this evidence. We find no error.

The challenged evidence consists of testimony from a BATF expert that three different sets of pliers recovered from defendant were used in making one or more of the bombs. According to this witness, one set of defendant's pliers was used to cut certain wire, the wire strippers were used to cut a different wire, and a third was used to fasten a cap to the pipe. The witness also testified that wires used in two of the bombs came from the same batch of wire.

In the initial pretrial motion challenging this testimony, defendant contended that the evidence was not based on a theory generally accepted in the scientific community, that no techniques in the examination were capable of producing reliable results, and that the prosecution's expert did not use tests that followed accepted scientific techniques. Accordingly, defendant contended that the testimony was inadmissible under the test first enunciated in *Frye v. United States, supra.*

See *Fishback v. People*, 851 P.2d 884 (Colo. 1993)(*Frye* test is applicable in determining admissibility of novel scientific evidence).

In response to this motion, the prosecution offered to prove that toolmark identification evidence had been accepted in a number of courts throughout the United States over an extended period of time. The prosecution relied upon citations to various appellate court decisions. On this basis, the prosecution contended that an evidentiary hearing was unnecessary. Defendant did not offer testimony or legal authority at the hearing to contradict the prosecution's position or otherwise to support the allegations in his motion.

The court ruled that, based upon these submissions, it appeared that the *Frye* test applied. It further concluded that defendant had failed to demonstrate a lack of general acceptance in the scientific community of the principles employed by the expert. Accordingly, the court denied the motion.

Defendant made a subsequent motion during trial for a hearing to determine whether the evidence should be admitted. In this motion, defendant argued that CRE 702 applied. The court also denied this motion.

In support of his argument on appeal, defendant notes that the BATF agent who served as the prosecution's expert did not have any post-high school formal education. Defendant also points out that no standard curriculum has been developed to train toolmark examiners and that no national certification program is available to confirm the knowledge and training of this type of expert.

Defendant further notes that, unlike fingerprint or ballistics testing, no data bank has been established relative to the various types of handtools. Conversely, defendant complains that the expert's testimony relative to the examination of only two consecutively manufactured tools is insufficient to support his claim that every tool leaves a mark or marks different from every other tool.

Finally, defendant relies upon the potential rate of error suggested by the record before us. For example, two additional toolmark and firearms examiners were called in by the

prosecution to review the tests and analysis conducted by the BATF agent. With reference to the three sets of pliers, these experts agreed with the agent as to the marks from one set but they determined that the tests were inconclusive as to the other two. As a result, defendant asserts that the prosecution has not been required to demonstrate properly the reliability of this type of evidence. We find no error in the court's rulings.

The prosecution's expert had been employed in law enforcement for approximately 30 years, including six years with the BATF. The witness testified as to his on-the-job training as a firearms and toolmark examiner and he indicated that he had testified in excess of 400 times as an expert. While the majority of this expert testimony had involved firearms, a significant part involved toolmarks.

The record reflects that the basic premise for toolmark analysis is that handtools used either to cut or to clamp softer materials may leave a specific and essentially permanent type of mark on that material. The softer material is examined under a microscope that magnifies the marks to 80 times their original size. The handtool can then be examined to determine whether the marks were left by that specific tool.

According to this expert, no two tools make exactly the same mark on softer material either because of the manufacturing process or because of the subsequent use or misuse of the tool. In this regard, the witness stated that he had never encountered any research or other data indicating that any two handtools of the same type can make the same mark.

Legal research reflects that experts in the use and analysis of tools have long been permitted to testify concerning the marks left by those instruments. See State v. Baldwin, 36 Kan. 1, 12 P. 318 (1886)(experienced carpenters permitted to testify that wood panel could have been cut by defendant's knife); see also A. Moenssens & F. Inbau, Scientific Evidence in Criminal Cases § 4.24 (2d ed.1978). Also, this testimony has addressed a number of different types of tools. See State v. Olsen, 212 Or. 191, 317 P.2d 938 (1957)(hammers); State v. Raines, 29 N.C.App. 303, 224 S.E.2d 232 (1976)(crowbar); State v. Wessling, 260 Iowa 1244, 150 N.W.2d 301 (1967)(screwdriver); State v. Churchill, 231 Kan. 408, 646 P.2d 1049 (1982)(knives). Hence, there is ample legal support for the trial court's conclusion that this type of evidence is accepted.

■ Addressing defendant's specific concerns in this case, we note generally that neither collegiate degrees nor formal training in an established curriculum is necessarily required before one may be considered an expert in a particular field. See CRE 703; see also People v. Perryman, 859 P.2d 263 (Colo.App.1993)(prosecution's expert had 16 years experience in the field of shoeprint identification and had attended seminars with leading authorities in the field). Indeed, as an example, an experienced auto mechanic may be better qualified to serve as an expert on certain aspects of a gasoline engine than a college educated automotive engineer.

Further, the fact that there are no points of comparison and data banks relative to tool examination, in our view, does not render the analysis inherently unreliable. See People v. Price, 903 P.2d 1190 (Colo.App.1995)(the fact that an expert cannot support an opinion with certainty goes to the weight of the evidence and not its admissibility). The analysis conducted by the expert, as here, can be evaluated and analyzed by other experts. See State v. Churchill, supra (defendant's expert challenged prosecution's toolmark expert's methods and conclusions). The critical factors are the marks, as magnified by the microscope, on the materials used in the bombs and similar test materials and the examination of the cutting or clamping face of the tool itself.

The expert's premise, that no two tools make exactly the same mark, is not challenged by any evidence in this record. Hence, the lack of a database and points of comparison does not render the opinion inadmissible.

Accordingly, we conclude that defendant's concerns address the weight to be accorded the expert's opinion and that no pretrial evidentiary hearing was required. See People v. Price, supra.

## II

■ Defendant next contends that the trial court erred in denying his motion to suppress evidence obtained during the initial search of his apartment. We disagree.

Although defendant was a suspect in the bombings, law enforcement officers did not have probable cause to obtain a warrant to search his apartment. A detective and two BATF agents went to defendant's apartment to discuss three telephone messages left by defendant at the police station indicating his objection to contacts made by an officer at his workplace. The goal of the officers was to question defendant and seek his consent to search the apartment.

The trial court's findings reflect the following sequence of events. The officers knocked and defendant opened his door eight to ten inches. Upon seeing the officers, defendant became angry. In a conversation lasting from three to five minutes, defendant asked the officers to leave three or four times. However, the officers persisted in their efforts with the detective emphasizing the seriousness of the crimes they were investigating, the fact that they wished to avoid contacting him at his place of employment, and the fact that they wished to have his cooperation.

One of the BATF agents told defendant that if he did not cooperate and answer their questions, he might be subpoenaed to appear before a federal grand jury in Denver. After this statement was made, the detective again requested defendant's cooperation and the officers were "allowed" to enter the apartment.

In this connection, the court noted that there was no evidence that defendant expressly invited the officers into his apartment by words or gestures. However, the court also implicitly found that no force was involved, and the court expressly refused to credit defendant's testimony that the detective put his foot in the door so that defendant could not close it.

The court's findings establish that, once inside the apartment, the officers talked to defendant for several minutes. Conversational tones were used and defendant appeared to calm down. Defendant seemed to be intelligent and answered questions appropriately. The officer then asked if defendant would consent to a search of his apartment and defendant agreed without hesitation.

The officer produced a consent to search form and explained that defendant did not have to allow a search and that he could stop the search at any time. After the form was read to defendant and after he also read the form, he signed it and the apartment was searched and evidence was seized.

On appeal, defendant argues that he did not voluntarily consent to the officers' warrantless entry into his apartment and that, therefore, his suppression motion should have been granted. Specifically, he contends that entry was obtained by coercion in the form of a threat to summon him before a grand jury that had not even been convened.

In addition, he asserts that the entry into his apartment was illegal because he did not expressly agree that the officers could enter the unit. Accordingly, defendant argues that the illegal entry also invalidated his consent to the search.

■ Both the Fourth Amendment and Colo. Const. art. II, § 7, prohibit warrantless searches of a person's residence. *People v. Hopkins,* 870 P.2d 478 (Colo.1994). However, this prohibition does not apply when voluntary consent has been obtained from the individual whose residence is searched. *See People v. McKinstrey,* 852 P.2d 467 (Colo.1993).

If the officers' entry into defendant's apartment was obtained without a legally valid consent, the search can be constitutionally invalid under the so-called fruit of the poisonous tree doctrine. *People v. Donald,* 637 P.2d 392 (Colo.1981). However, if the consent to search was voluntary, the search may be permissible even though the entry was illegal. Resolution of this issue depends upon whether the consent to search was obtained by the officers taking advantage of the illegal entry. *See People v. Mack,* 895 P.2d 530 (Colo.1995).

■ Whether the consent was voluntary and thus an act of free will involves questions

of fact to be determined by the trial court based on the totality of the circumstances surrounding the event. *People v. Breidenbach,* 875 P.2d 879 (Colo.1994). The prosecution carries the burden to establish by clear and convincing evidence that the consent was voluntary, and the trial court's resolution of this issue must be upheld on appeal unless the decision was clearly erroneous. *People v. Drake,* 785 P.2d 1257 (Colo.1990).

■ Factors involved in the determination of whether the consent was voluntary include the defendant's age, education, intelligence, state of mind, the duration and location of the search, the gravity of any official misconduct, and any other relevant circumstances. *People v. Breidenbach, supra.*

Here, the trial court properly required the prosecution to meet the clear and convincing evidence standard and it applied the totality of the circumstances test. In reaching its conclusion that the consent was voluntary, the court relied upon its findings that once the officers entered the apartment, defendant's anger abated and he was calm and cooperative. The officers were not in uniform and did not display any weapons. They spoke in conversational tones for several minutes before a search was discussed.

Defendant responded appropriately to the officers' questions and understood what was asked of him. Defendant was 28 years of age at the time, a high school graduate, and had taken some high school classes in electronics. He was instructed verbally and in writing that he had the right to refuse to consent to the search and that he could stop the search at any time. He read and signed the consent form without hesitation and neither stopped nor complained about the search while it was being conducted.

With reference to the officer's comment regarding the grand jury, the trial court determined that the statement did nothing more than advise defendant of the options available to law enforcement and that it did not rise to a level of coercion which would overcome defendant's will. In this connection, defendant testified that he knew he was not under arrest and that he understood he had the right to refuse to permit the search.

There is no evidence in the record or finding by the trial court to support a conclusion of flagrant misconduct by the officers. *See People v. Milton,* 826 P.2d 1282 (Colo.1992). Thus, contrary to defendant's contention, we do not view *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) as support for his claim of coercion. There, the officer stated falsely that he already had a search warrant prior to receipt of an oral consent for a search. Here, however, the record reveals no misrepresentations and that the officer's comment related to a possible grand jury appearance and not the issuance of any search warrant.

Hence, given the applicable standard of appellate review, we perceive no error in the court's ruling. *See People v. Drake, supra.*

## III

■ Defendant finally contends that the trial court erred in declining to hold a veracity hearing to test a detective's affidavit filed in support of a search warrant for a subsequent search of defendant's apartment. Again, we find no error.

In his motion challenging the affidavit and as pertinent here, defendant asserted that certain statements in the affidavit relative to the components of the bombs, items recovered after the bombs exploded, and the structure of the bombs were contradicted by other written data in the possession of the police officers at the time the affidavit was signed. The motion further asserted that the wire recovered from defendant's apartment in the initial search was not "consistent" with that used in the bombs. The motion also called into question statements in the affidavit about what had been discovered in the investigation of the original bombs.

No affidavit was initially filed in support of defendant's motion as required by *People v. Dailey,* 639 P.2d 1068 (Colo.1982). Later, an affidavit signed by one of defendant's trial attorneys was filed. The only reference to misstated facts consists of: "[C]ounsel believes in good faith that there is a valid basis to challenge the veracity [of statements] in the [detective's] affidavit...."

In denying the motion, the court first ruled that a hearing was unnecessary because

there were no fact specific affidavits filed to support the claim that there were misstatements in the detective's affidavit. In this regard, the court relied upon *People v. Flores*, 766 P.2d 114 (Colo.1988) and *People v. Dailey, supra.*

On appeal, defendant in effect contends that because the motion alleged that facts had been misstated based upon prior police reports produced in discovery, no verification was necessary to establish a good faith basis for a veracity hearing. We disagree.

The detective's affidavit in support of the search warrant consists of 15 pages of single-spaced typed material. Based on defendant's offer of proof that the court accepted following its ruling, it appears that some of the asserted misstatements may well involve the proper interpretation of various reports that were furnished to defendant.

In addition, the remainder of the affidavit that is not challenged contains substantial and significant information about defendant including, for example, his volatile temper and his violent conduct from time-to-time, his refusal to seek mental health counseling at the urging of family members, and a note obtained from his apartment in a prior search in which he threatened to kill some "innocent" person. Further, the affidavit sets forth a profile of the bomb suspect that was obtained from the Federal Bureau of Investigation based upon information supplied concerning the various incidents. A significant amount of the information in the affidavit concerning defendant is consistent with this profile.

Under these circumstances, even if we assume that unexplained contradictions in police reports might warrant a veracity hearing in an appropriate case, we conclude that this is not such a case. Hence, we affirm the trial court's ruling. *See People v. Flores, supra; see also People v. Siegl*, 914 P.2d 511 (Colo. App.1996).

The judgment is affirmed.

HUME and JONES, JJ., concur.