542 So.2d 352 (1989)
Joseph Jerome RAMIREZ, Appellant,
v.
STATE of Florida, Appellee.
No. 66992.
Supreme Court of Florida.
March 16, 1989.
Rehearing Denied May 26, 1989.
Michael B. Chavies, Miami, for appellant.
Robert A. Butterworth, Atty. Gen., and Charles M. Fahlbusch, Asst. Atty. Gen., Miami, for appellee.
PER CURIAM.
Joseph Jerome Ramirez appeals his conviction of first-degree murder and sentence of death. We have jurisdiction.[*] We reverse both the conviction and the sentence of death.
The relevant facts are as follows. Early Christmas morning in 1983, the body of a twenty-seven-year-old woman was discovered in the Miami Federal Express building where she worked as a night courier. She had died of multiple stab wounds to her *353 body and blunt trauma to her head. Additional injuries included cuts on her hands and back and one stab wound into her chest cartilage. At the scene, police found blood spatters and pools throughout the dispatch area and break room indicative of a struggle. A bloody paper napkin and bloodstained fragments of a missing sixty-seven-pound telex machine were also discovered. The hot water faucet in the women's restroom was turned on full force. One truck had been tampered with and one of the loading bay doors was unlocked. The desk of an employee who sold jewelry had been opened, and a mail bag containing approximately $430 was missing. A hair was discovered on the victim's hand. Experts compared hair samples taken from Ramirez with that hair and determined that the hair found on the victim's hand did not belong to Ramirez.
The police discovered a bloody fingerprint on a doorjamb near the victim's body. From a photograph of the patent partial left thumbprint, a technician found ten points of similarity. Despite the fact that only approximately ten percent of the fingerprint area was discernible, the technician positively identified the fingerprint as belonging to Ramirez, an employee of an independent janitorial company which serviced the Federal Express offices. Based upon the fingerprint identification, Ramirez was arrested and charged with first-degree murder.
Police investigation established that Ramirez had cleaned the Federal Express office on the afternoon of December 24. A week earlier, on December 17, the victim was unable to locate her keys to the building and had duplicates made. The lost keys were never found. Also, on December 17, Ramirez stayed late to do extra cleaning and special arrangements were made to give a key to the manager of the janitorial service. Federal Express's general policy prohibited giving janitors keys. On December 24, Ramirez mentioned to a Federal Express supervisor that the key he had been given on the 17th did not fit a door which he, as a janitor, would have had no reason to use. On December 24, Ramirez inquired about the amount of revenues coming in and was told by the supervisor that they had a good business. Several people including Ramirez were also working in the area that day when the money was counted and placed in the mail bag.
The girlfriend testified that at approximately 6:00 p.m. on Christmas Eve Ramirez returned to their residence. She stated that Ramirez left at around 9:00 p.m. in her Renault automobile to visit the home of some friends and that he was wearing a navy blue sweater with a fox emblem on the front. He remained at his friends' home until approximately 11:00 p.m. The appellant's girlfriend testified that Ramirez had returned home at some time during the night, but that she had not noted the time. However, when she arose at 5:30 a.m., Ramirez was at home. From the time Ramirez left his friends' home until sometime in the early hours of Christmas Day, his whereabouts were unknown.
When asked to produce the clothing he wore on Christmas Eve night, Ramirez told police the sweater he had worn was at Alvarez Cleaners, but the police were unable to locate a dry-cleaning establishment of that name. An inquiry of other dry cleaners in the area did not turn up the sweater. On December 28, Ramirez volunteered to the police a sweater he claimed to have worn Christmas Eve. The sweater was devoid of any emblem. Ramirez claimed the fox emblem had fallen off in the wash. When the police arrested Ramirez on December 28, they found a department store sales receipt in his wallet which indicated he had purchased the sweater that day. A store employee remembered selling Ramirez the sweater because she noticed his expensive watch. According to his girlfriend, Ramirez had purchased the watch on December 26. His old watch, found in the bedroom of his residence, appeared to have traces of blood on the band.
In the search of the Renault, police found a knife which Ramirez's girlfriend kept in the car for protection. The girlfriend testified that after Christmas she had found the knife in her kitchen sink and *354 washed it. Her daughter returned the knife to the Renault when Ramirez, while cleaning the car, requested it to cut some string. Traces of some type of blood were detected on the knife, but in insufficient amounts to determine their origin. No blood stains were detected on either Ramirez's sneakers or the pants he purportedly wore on the night of the murder. A police technician, who was qualified as a tool mark expert, testified that the knife found in the trunk of the Renault was the specific knife which produced the victim's chest wound.
A detective called by the state related on cross-examination that Ramirez had confessed to a cellmate. The prosecutor had not intended to use this testimony because he had concluded that no confession had been made. Ramirez objected to the testimony and moved for a mistrial. The trial judge determined the cellmate had lied, gave the jury the curative instruction that Ramirez had not confessed, obtained the jurors' assurances that revelation of the alleged confession would not prejudice them, and then denied the motion for mistrial.
During the defense's case, a doctor testified that he treated a cut on Ramirez's left wrist on January 10, 1984. Ramirez told the doctor he cut his wrist with a sharp object while working as a janitor. On cross-examination, the state presented testimony to establish that Ramirez had asked a friend to bring a thumbtack to the jail prior to January 10, 1984. During cross-examination, the state also introduced two paragraphs from Ramirez's sworn statement from the pretrial motion to suppress hearing for the purpose of impeaching statements made by Ramirez which the doctor related at trial. In his prior sworn statement, Ramirez stated he cut his finger on Christmas Eve while picking up glass at an apartment complex, and that his bloody fingerprint could have been left at the crime scene prior to the murder. Other witnesses, including his girlfriend and the arresting officers, testified that his wrists and fingers were not cut on December 25 or December 28.
The jury found Ramirez guilty of first-degree murder, armed robbery, and armed burglary, and unanimously recommended the death penalty. The trial court, in imposing the death penalty, found four aggravating factors: 1) Ramirez had been previously convicted of a violent felony; 2) the capital felony was committed during a robbery and burglary; 3) the capital felony was committed to avoid arrest; and 4) the crime was especially heinous, atrocious, and cruel. In mitigation, the trial court recognized appellant's close family ties. Prior to imposition of the sentence, the trial court reviewed a ten-year-old presentence investigation report.
Ramirez contends his convictions should be set aside because: 1) the trial court erroneously allowed a ballistics and tool mark expert to conclusively identify the knife as the murder weapon; 2) portions of his sworn statement in the motion to suppress were improperly introduced at trial by the state; 3) the state attorney failed to supply the defense with the name of the cellmate to whom Ramirez allegedly confessed; 4) there was insufficient circumstantial evidence to support a finding of guilt; and 5) the trial court improperly denied his motion to suppress physical evidence. The first ground is dispositive of this proceeding.
Ramirez argues that the trial court, after qualifying a technician as an expert in tool mark identification, erroneously allowed him to conclusively testify that a knife found in the Renault was the knife that killed the victim. The trial court allowed the expert to state, "The result of my examination made from the microscopic similarity, which I observed from both the cut cartilage and the standard mark, was the stab wound in the victim was caused by this particular knife to the exclusion of all others." The technician explained that he had compared a piece of cut cartilage from the body of the victim to knife impressions, using the knife in question, but had made no comparisons with other knives.
In reviewing the record, we find that no scientific predicate was established from independent evidence to show that a specific *355 knife can be identified from the marks made on cartilage. The only evidence received was the expert's self-serving statement supporting this procedure. The medical examiner testified that this type of knife could have made this type of stab wound. The trial judge expressed concern about this type of evidence when he stated, "For the first time in the history of the Florida courts... I have permitted into evidence knife prints, which the jury considered in the course of arriving at their verdict."
The state, in support of the expert's qualifications, noted that the technician coauthored a scholarly article which positively identified a knife as the tool that caused a particular stab wound to a piece of human cartilage. The procedure the technician utilized in this case was that discussed in the article. The state argues that simply because this technician had not previously testified in court in a knife identification case, he should not be disqualified as a witness. The state suggests we adopt the reasoning of the Supreme Court of Kansas in State v. Churchill, 231 Kan. 408, 646 P.2d 1049 (1982), which approved the admissibility of similar evidence concerning a knife mark in human cartilage.
The determination of a witness's qualifications to express an expert opinion is peculiarly within the discretion of the trial judge, whose decision will not be reversed absent a clear showing of error. Johnson v. State, 393 So.2d 1069, 1072 (Fla. 1980), cert. denied, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981); Endress v. State, 462 So.2d 872, 873 (Fla. 2d DCA 1985); Seaboard Air Line R.R. Co. v. Lake Region Packing Ass'n, 211 So.2d 25, 31 (Fla. 4th DCA), cert. denied, 221 So.2d 748 (Fla. 1968). The qualification of the witness is not, however, the primary issue in this case. Rather, the real issue is the reliability of testing methods which form the basis of the witness's conclusion.
This Court, as most other courts, will accept new scientific methods of establishing evidentiary facts only after a proper predicate has first established the reliability of the new scientific method. This point is illustrated by recent decisions of this Court. In Ramos v. State, 496 So.2d 121 (Fla. 1986), we reversed the appellant's conviction and remanded for a new trial because we found that no proper predicate was presented to establish the reliability of dog scent discrimination lineups. As in the instant case, the only evidence concerning the scent discrimination lineup's reliability was the testimony of the dog handler. We have previously rejected, because of an improper predicate of scientific reliability, hypnotically recalled testimony, Bundy v. State, 471 So.2d 9 (Fla. 1985), cert. denied, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986), and polygraph tests, Delap v. State, 440 So.2d 1242 (Fla. 1983), cert. denied, 467 U.S. 1264, 104 S.Ct. 3559, 82 L.Ed.2d 860 (1984). We reject the state's argument that, since the Supreme Court of Kansas in Churchill admitted testimony that a particular knife caused the wound, without a predicate of scientific reliability, we should do likewise. Clearly, in the instant case, insufficient evidence exists to establish the requisite predicate for the technician's positive identification of the knife as the murder weapon.
We find the testimony positively identifying this particular knife as the murder weapon inadmissible. The knife itself, however, could have been properly admitted as relevant evidence because it was an instrument which could have caused the victim's wounds, based on the medical examiner's testimony and the other evidence linking this knife to Ramirez. Specifically, the knife was regularly kept in Ramirez's girlfriend's Renault which he drove; after Christmas his girlfriend found the knife in her kitchen sink and washed it; the knife had bloodstains on it but in insufficient amounts to determine their origin; and samples of blood consistent with the victim's bloodtype were found on the molding of the Renault's trunk.
Having determined that the knife in question could properly be admitted as the instrument that could have caused the victim's wounds, we now turn to the question of whether the erroneous admission of the testimony of the expert, positively identifying *356 the knife as the weapon that caused the wounds, constitutes harmless error. The principles of harmless error set forth in State v. DiGuilio, 491 So.2d 1129 (Fla. 1986), require the state to establish "beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." Id. at 1138. As we explained: "[T]he test requires not only a close examination of the permissible evidence on which the jury could have legitimately relied, but an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict." Id. Further:
The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict.
Id. at 1139.
Under the DiGuilio test, we do not find that "there is no reasonable possibility that the error contributed to the conviction." Id. at 1138 (emphasis added). The statements made by the tool mark expert which linked the murder weapon to the defendant quite possibly could have influenced the jury verdict. We find that the testimony of the tool mark expert positively identifying Ramirez's knife as the murder weapon cannot be viewed as harmless error, particularly in view of the fact that there was some limited evidence from which the jury could infer that Ramirez did not commit the offense.
Accordingly, for the reasons expressed, we reverse the convictions and the sentence of death, and remand this cause for a new trial.
It is so ordered.
OVERTON, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
EHRLICH, C.J., and McDONALD, J., dissent.
NOTES
[*] Art. V, § 3(b)(1), Fla. Const.